UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SARAH OKUMA,<br><br>Plaintiff,<br><br>v.<br><br>MAN INVESTMENTS USA HOLDINGS, INC., MAN GROUP, LTD., ANTOINE FORTERRE, and ROBERTO CANENTI,<br><br>Defendants. | C.A. No. ______________ |

# COMPLAINT

1. Plaintiff, Sarah Okuma ("Okuma" or "Plaintiff") was employed by Defendant Man Investments USA Holdings, Inc. and the Man Group Ltd. (together, the "Company") since 2018. Most recently, Okuma served as Head of People, Americas and APAC (Asia and Pacific), in which capacity she was one of very few women within the Company's leadership, particularly in the United States. During her employment, Okuma observed numerous ways that she and other women at the Company were underpaid and otherwise mistreated, as compared to their male colleagues, continuously, pervasively and repeatedly, throughout her tenure of employment. Okuma's internal complaints concerning sexism, which she submitted to her direct individual supervisors, Defendants Antoine Forterre ("Forterre") and Roberto Canenti ("Canenti"), were largely unheeded by Company leadership, and which continued unabatedly and from which Okuma was retaliated against in regard to the terms and conditions of her employment. Examples include, but are not limited to, Okuma learning in 2024 that her male colleagues in Boston received 2023 bonuses that were between 37% and 162% greater than

Okuma's. She complained of this sex-based pay differential by a letter from her attorney dated June 7, 2024, and was terminated just *four* days later, with no investigation into her discrimination complaint and in obvious retaliation for her protected activity.

## THE PARTIES

2. Plaintiff Sarah Okuma is a natural person who identifies as female and who resides in Providence, Rhode Island.

3. Defendant Man Investments USA Holdings Inc. ("Man USA") is a corporation organized under the laws of Delaware with a principal place of business located at 1345 Avenue of the Americas, 21st Floor, New York, NY 10105.

4. Defendant Man Group Ltd. ("Man Group," or with Man USA, "Man" or "the Company") is a global investment management firm, with headquarters located at Riverbank House, 2 Swan Lane, London, EC4R 3AD, United Kingdom. At all times relevant to this Complaint, the Company made decisions concerning Okuma's employment, compensation and separation.

5. Defendant Antoine Forterre ("Forterre") is a natural person who identifies as male and who is the Chief Financial Officer (CFO) and Chief Operating Officer (COO) of Man Group. On information and belief, Forterre made or approved all compensation decisions within the Company, including with respect to Plaintiff. Forterre resides in London, United Kingdom, and regularly travelled to the United States, including to Massachusetts several times per year, on behalf of the Company.

6. Defendant Roberto Canenti ("Canenti" or with together Man USA, Man Group, and Forterre, the "Defendants") is a natural person who identifies as male and who resides in Farnham, Surrey, United Kingdom. Canenti was the Interim Chief People Officer of the Man

Group and travelled to Massachusetts in connection with his job duties for the Company, including without limitation to meet with Plaintiff.

7. At all times hereinafter alleged, Forterre was and is an officer, director, shareholder, agent, servant and/or employee of Man Group.

8. At all times hereinafter alleged, Canenti was an officer, director, shareholder, agent, servant and/or employee of Man Group.

9. At all times hereinafter alleged, Forterre was Okuma's supervisor, and as such, Forterre directed and controlled the terms and conditions of Okuma's employment at Man USA.

10. At all times hereinafter alleged, Forterre was Okuma's supervisor, and as such, Forterre directed and controlled the terms and conditions of Okuma's employment at Man Group.

11. At all times hereinafter alleged, Canenti was Okuma's supervisor, and as such, Canenti directed and controlled the terms and conditions of Okuma's employment at Man USA.

12. At all times hereinafter alleged, Canenti was Okuma's supervisor, and as such, Canenti directed and controlled the terms and conditions of Okuma's employment at Man Group.

13. Any and all of the actions, conduct, behavior, and occurrences of Forterre, as is alleged herein, were conducted, actuated and performed with the knowledge, consent, authority, and ratification, and within the scope of his duties and responsibilities as an agent, servant and/or employee of Man Group.

14. Any and all of the actions, conduct, behavior, and occurrences of Canenti, as is alleged herein, were conducted, actuated and performed with the knowledge, consent, authority, and ratification, and within the scope of his duties and responsibilities as an agent, servant and/or employee of Man Group.

15. At all times hereinafter alleged, Man USA employed six or more employees and as such constituted and constitutes an "employer" within the meaning of Chapter 151B, § 1 et seq., of the General Laws of the Commonwealth of Massachusetts and interpreting case precedent (hereinafter "Chapter 151B").

16. At all times hereinafter alleged, Man USA employed persons and as such constituted and constitutes an "employer" within the meaning of Section 296 et seq., of the Executive Law of the State of New York and interpreting case precedent (hereinafter "New York Executive Law").

17. At all times hereinafter alleged, Man Group employed six or more employees and as such constituted and constitutes an "employer" within the meaning of Chapter 151B, § 1 et seq.

18. At all times hereinafter alleged, Man Group employed persons and as such constituted and constitutes an "employer" within the meaning of Section 296 et seq., of the New York Executive Law.

19. At all times hereinafter alleged, Okuma was an "employee" as that term is defined by the New York Executive Law.

20. At all times hereinafter alleged, Forterre was an "aider and abettor," as that term is defined by the New York Executive Law.

21. At all times hereinafter alleged, Canenti was an "aider and abettor," as that term is defined by the New York Executive Law.

22. At all times hereinafter alleged, Forterre was an "supervisor," as that term is defined by the New York Executive Law.

23. At all times hereinafter alleged, Canenti was an "supervisor," as that term is defined by the New York Executive Law.

24. At all times hereinafter alleged, Forterre was and is an individual subject to liability to Okuma herein, as per the New York Executive Law.

25. At all times hereinafter alleged, Canenti was and is an individual subject to liability to Okuma herein, as per the New York Executive Law.

26. At all times hereinafter alleged, Man USA is an "employer" as that term is defined in the relevant provisions of Article 1, § 190, et seq., of the Labor Law of the State of New York, and by interpreting case precedent (hereinafter the "New York Labor Law.")

27. At all times hereinafter alleged, Man Group is an "employer" as that term is defined in the relevant provisions of the New York Labor Law.

**JURISDICTION AND VENUE**

28. This Court has jurisdiction over this action, pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000; the Plaintiff is a citizen of Rhode Island, and the Defendants are citizens of (without limitation) New York and the United Kingdom.

29. Pursuant to 28 U.S.C. § 1391, venue properly lies in this district, without limitation, because the Company does business in this district.

**STATEMENT OF FACTS APPLICABLE TO ALL CAUSES OF ACTION**

30. Okuma received her Bachelor's Degree in Human Development from Prescott College in 2003.

31. Thereafter, in 2010, she earned her Master of Business Administration degree from Case Western Reserve University.

32. Okuma holds numerous professional certifications, including for coaching and professional development.

33. From 2015 to 2018 Okuma was the Global Director of Talent for International Game Technology PC ("IGT"), an international company with approximately 12,000 employees operating in approximately 100 countries and 40 U.S. states.

34. Okuma left IGT in 2018 to join Man, in which capacity she was hired in the position of Talent Coach and Consultant.

35. Okuma's employment agreement with the Company contained a New York state governing law and a New York state choice of forum provisions, specifying:

> This Agreement shall be governed by the internal laws of the State of New York, without regard to its conflict of laws rules. Any action by the parties related to this Agreement or Employee's employment . . . shall be brought in any state or federal court having proper subject matter jurisdiction within New York, New York. The parties hereby irrevocably consent to, and agree not to object or assert any defense or challenge to, the personal jurisdiction and venue of any such court.

36. Notwithstanding these provisions, Massachusetts law is applicable.

37. Okuma was the Company's first U.S.-based employee on its Talent team.

38. At all times relevant to this Complaint, Okuma worked for the Company in Massachusetts, largely from Man's office located at 200 Pier 4 Blvd., Fifth Floor, Boston, Massachusetts.

39. Initially, Okuma reported to Lara Carty ("Carty"), then-Global Head of Talent of Man Group.

40. Ms. Carty was based in the United Kingdom and promoted to Chief People Officer in or about late 2022 or early 2023.

41. From on or about September 18 through December 31, 2023, Okuma reported directly to Forterre, then CFO of Man Group.

42. On information and belief, Forterre made or approved all compensation decisions within the Company, including with respect to Plaintiff.

43. Throughout Plaintiff's employment, the Man Group's Executive Committee Members regularly traveled to and worked in the United States, including Massachusetts, for internal meetings, client meetings, board meetings, and for other business purposes.

44. In April 2023, the Company promoted Okuma to the position of Head of People, Americas and APAC (Asia and Pacific), in recognition of her strong performance and hard work.

45. This promotion took place when Okuma's prior role as Talent Coach and Consultant, U.S., was combined with the responsibilities of the then-Head of Human Resources, U.S. and APAC.

46. In her new role, Okuma oversaw human resources functions for approximately 500 employees on four continents for Man.

47. On July 1, 2023, Okuma received a raise from $190,000 annually to $210,000 per year, in connection with her promotion several months earlier.

48. This raise was not applied retroactively, even though Okuma had been performing her expanded role since the start of 2023.

49. Okuma received a second salary increase, to $250,000 per year, on March 1, 2024.

50. Again, this raise was not applied retroactively.

51. As Head of People, Americas and APAC, Okuma ensured Man's compliance with federal, state and local legal requirements for employees within all jurisdictions in the United States, as well as in China, Hong Kong, South Korea, Australia and Japan.

52. Okuma managed a team that advised, developed and executed the full employee life cycle, including with respect to employee onboarding, transfers, termination, immigration and global mobility, benefits, payroll, data and reporting, audit requests and compensation.

53. Okuma oversaw recruitment for these regions, partnered with Man's senior stakeholders, consulted with them on human resources strategy and practices, and supported employees and managers in their professional growth and development.

54. Okuma also oversaw people partner functions under the Chief Operating Officer of the Man Group, globally. This included every team under the COO, i.e. Central Trading and Execution, Operations, Fund Treasury, Rest of World Office and Corporate Real Estate.

55. Okuma also oversaw people partner functions for Global Sales and Marketing, Numeric Investments, and for all of Discretionary (globally).

56. Most recently, Okuma was rated in Man's internal employee rankings as "1" (on a scale of 1 to 4), i.e. as "Outstanding."

57. In 2023, Okuma went above and beyond by implementing the restructuring changes that overhauled and combined People functions, overseeing the human resources aspects of Man's acquisition of Varagon Capital Partners ("Varagon") in the summer of 2023, and assisting in the transition from Ms. Carty that fall.

58. Okuma worked nights and weekends; canceled a scheduled vacation in August, 2023; and even delayed her planned foot surgery from summer to fall 2023 (and later for several months beyond that) at the Company's behest, due to workload associated with the Varagon transition and her increased responsibilities for Man.

59. Specifically, Okuma required surgery on her left foot related to arthritis and prior injuries that, without limitation, negatively impacted her ability to stand for prolong periods, walk, sleep, and engage in daily activities of living.

60. Without the surgery, Okuma's pain would become progressively worse.

61. Man's leadership was aware of Okuma's foot condition and need for surgery since the spring of 2023, if not earlier.

62. On December 4, 2023, Canenti joined Man, initially as an HR consultant.

63. Throughout their time working together, Canenti and Okuma held regular meetings.

64. From the start of their interactions, Canenti was accusatory, condescending and dismissive, and of Okuma in particular.

65. In January 2024, Canenti told Okuma, "I'm planning on being here for the long haul. It's clear that things have not been done the right way, and I'm here to fix these mistakes," or words to that effect.

66. In reply, Okuma told Canenti that there were some issues between the team members that she believed he needed to be aware of, to which he responded that he believed she was "pulling the wool over [his] eyes," or words to that effect.

67. Although they were in the same field, and despite Okuma's experience and senior role, Canenti often spoke to Okuma as if she was an incompetent novice.

68. Canenti frequently rewrote Okuma's communications with U.S. employees, for example messaging around compensation, in ways that did not change the substance, and then put his name on it.

69. Canenti micromanaged Okuma, as if she was a much more junior employee, for example by explaining basic human resources procedures and principles to her.

70. Canenti would also go around Okuma to meet directly with various U.S.-based executives whom Okuma directly supported, including the Chief Operating Officer, who was based in Boston.

71. This course of action undermined Okuma and often made the executives uncomfortable.

72. Canenti circumvented Okuma and spoke with Executive Committee Members about Okuma's team without even speaking to Okuma.

73. Canenti expressed concerns about "cattiness," or words to that effect, on Plaintiff's largely female team.

74. Okuma and several other women employees relayed concerns about Canenti's treatment of them and their female colleagues, as compared to their male colleagues, to the Company's leadership.

75. In response, Forterre told Okuma that Canenti had been provided feedback and that Canenti should be changing his behavior.

76. In effect, Forterre told Okuma to stop bringing concerns about Canenti to him because Forterre believed that the issues had been addressed.

77. Forterre provided no guidance or support on how Okuma could address any issues with Canenti going forward.

78. Canenti's behavior continued to be problematic, particularly to his female colleagues, as compared to male colleagues.

79. At Forterre's encouragement and behest, Okuma agreed to postpone her foot surgery again, so that she could fill in for Carty after Carty's dismissal.

80. Okuma told Forterre that she would need to have the surgery over the winter of 2023-2024.

81. On December 18, 2023, within days of Okuma's conversation with Forterre concerning Canenti's troubling workplace behavior, Canenti was named Interim Chief People Officer.

82. On January 1, 2024, Okuma began reporting to Canenti instead of Forterre.

83. Very soon after, on February 7, 2024, Forterre informed Okuma that her bonus for 2023 was $160,000.

84. This amount was far less than the bonuses given to her male peers and was even less than her own bonus for 2022.

85. Indeed, Okuma's total compensation for 2023 (i.e. $370,000) was less than her 2022 compensation, despite her promotion, strong performance and increased responsibilities.

86. Okuma's total compensation was also dramatically lower than similarly situated male employees.

87. Okuma took medical leave from approximately February 9 to April 1, 2024, to have the long-delayed surgery on her foot and to recover therefrom.

88. Okuma's leave for her foot surgery was taken pursuant to Chapter 175M, § 1 et seq., of the General Laws of the Commonwealth of Massachusetts, which is known as the Massachusetts Paid Family Medical Leave Act ("PFML").

89. On information and belief, the Company underpaid Okuma in retaliation for her complaints of sex discrimination, without limitation in an attempt to push her out of her role by underpaying her.

90. Plaintiff identified five male employees, all based in Boston, whose compensation for 2023 was substantially (and in some instances dramatically) greater than her compensation,

despite being of a similar or lower rank to Plaintiff and having similar or less demanding responsibilities than Plaintiff.

91. One such male employee was the Co-Head of a department in Boston ("Comparator No. 1").

92. Like Okuma was, Comparator No. 1 is a "manager of managers."

93. Comparator No. 1 has direct reports in the U.S. and U.K., and like Okuma, was considered a senior manager of the firm" i.e. Executive Committee-1.

94. Comparator No. 1's 2023 salary of $230,000 was greater than Okuma's but the differential between their 2023 bonuses is astounding.

95. Comparator No. 1's 2023 bonus of $740,000 was more than four times' Okuma's bonus, and more than three times his own salary.

96. Another such male employee was a department head in Boston ("Comparator No. 2").

97. Comparator No. 2 was a frontline manager and is at the level of Executive Committee-2, and has direct reports in the U.S., U.K. and APAC.

98. Comparator No. 2's 2023 bonus of $582,591 was 233% of his salary, which was also greater than Okuma's.

99. Another better compensated male employee in the Boston office held a position of as a Principal Engineer, Deputy Head in Front Office Engineering ("Comparator No. 3").

100. Comparator No. 3, like Okuma, was a "manager of managers," but he was of lower rank at Executive Committee-2, and reported to Comparator No. 1.

101. Comparator No. 3 had direct reports in the U.S. only.

102. Despite Comparator No. 3's lower seniority, his salary of $230,000 was greater than Okuma's over the course of the year, but the bonus differential between the two is even more remarkable; Comparator No. 3's bonus of $340,000 was more than double Okuma's.

103. A fourth better compensated male employee in the Boston office was a Principal Trader ("Comparator No. 4").

104. Comparator No. 4 had no direct reports.

105. Comparator No. 4 was at the level of Executive Committee-3, two levels below Okuma, reporting to Comparator No. 2.

106. Comparator No. 4's 2023 salary of $200,000 was less than Okuma's salary, but only marginally so.

107. At $355,000, Comparator No. 4's 2023 bonus was more than double Okuma's bonus.

108. The fifth better compensated male employee in the Boston office was another Principal Trader ("Comparator No. 5").

109. Comparator No. 5 did not have any direct reports.

110. Comparator No. 5 was at the level of Executive Committee-3, two levels below Okuma, and in 2023, had a salary of $185,000.

111. Comparator No. 5's bonus (of $325,000) was more than double that of Okuma's bonus.

112. Each one of these five men received total comp for 2023 that was between 37% and 162% greater than Okuma's.

113. Alarmed at her bonus figure, as compared to those of her Boston-based male colleagues, Okuma pushed back.

114. Okuma had been involved in setting and adjusting 2023 bonuses to ensure pay equity (including on the basis of sex) among employees in the Americas and in APAC, but of course had not been involved in her own bonus structure.

115. On information and belief, the Company took no steps whatsoever to ensure that Okuma's compensation, including her bonus, was equitable.

116. Okuma was concerned that she was being paid substantially less than her male colleagues because of her sex or otherwise in violation of pay-equity laws.

117. Okuma contacted Canenti and Forterre and performed for them the same analysis that she had used to examine and adjust other employees' bonuses for pay equity issues.

118. In doing so, Okuma was clear that she was concerned about her own gender-based pay disparity and Man's likely violation of pay-equity laws.

119. In response, Canenti justified Okuma's very low bonus (as compared to those of her male peers) based on rationales that did not hold water or that otherwise did not comply with the law.

120. For example, Canenti claimed that Okuma's bonus was justified because she had received a raise for her promotion.

121. This explanation ignores that the reasons for Okuma's salary increase was her increased responsibility and strong performance meriting her promotion; neither justified decreasing her bonus, never mind her total compensation.

122. This rationale also ignored that Okuma's 2023 salary was less than that of her male peers, whose bonuses were nonetheless substantial.

123. Mr. Canenti also pointed out that Okuma's bonus was greater than others in the People function; that explanation, however, was nonsensical because each and every employee in

People functions in the United States reported to Okuma and, therefore, would be expected to have lower bonuses than she.

124. This justification, however, does not comport with the Massachusetts pay-equity law or the New York pay-equity law, neither of which permits pay disparities between men and women based on employees' departments.

125. Further, to the extent that the Company bases its pay disparity on the employee's department, this creates an unlawful disparate impact on women, who comprise the majority of the People roles at the Company but who are represented in much smaller numbers elsewhere at Man.

126. Regrettably, and despite assurances from leadership, Canenti's poor treatment of female employees, including Okuma, persisted. Examples include:

a. Belittling the senior, female People team members;
b. Telling Okuma, in reference to Canenti's stated concerns about Okuma's female direct report while Okuma was on leave, that he believed the employee's struggles were less work-related and more from "learning how to work and be a mother," or words to that effect;
c. Referring to a senior people partner, who is a woman of color, as his "secretary" multiple times, after she repeatedly pulled together meetings and agendas that he was supposed to be doing;
d. Winking at young, female employees, which made them feel uncomfortable; and
e. Failing to check in with the women reporting to Okuma during Okuma's recent family and medical leave, despite promising that he would do so.

127. Okuma made various internal complaints concerning mistreatment of female employees, to little or no effect.

128. A grievance that Okuma filed on April 10, 2024 resulted in a lackluster investigation, unreasonably investigated and remediated, including but limited to apparently not interviewing various individuals likely to have relevant information.

129. A formal write-up was vague and unsatisfactory, focusing on Canenti's tone and word choice, and ignoring the fact that employees were explicitly complaining of *sex discrimination*.

130. Okuma attempted to remedy these issues, including without limitation, through a letter from her attorney to the Company USA's General Counsel by mail and email on June 7, 2024, complaining of the discrimination and retaliation set forth above.

131. Yet again, the Company failed to conduct any investigation into Okuma's concerns about discrimination.

132. Instead, on June 11, 2024, just five days after the Company received her counsel's letter, the Company abruptly terminated Okuma's employment in a video meeting in which Forterre participated.

133. On information and belief, Forterre and Canenti made and/or contributed to the decision to terminate Okuma's employment.

134. In the termination decision, Forterre represented that Okuma's termination was due to a planned reorganization.

135. However, the only employee who was eliminated amid this supposed "reorganization" was Okuma.

136. Further, Okuma's key roles remained crucial to the organization.

137. The Company's stated rationale for terminating Okuma's employment is a pretext for discrimination and retaliation.

138. On or about November 8, 2024, Okuma filed a timely complaint of discrimination and retaliation with the Massachusetts Commission Against Discrimination (MCAD) concerning the violations of law set forth herein.

## PLAINTIFF'S CLAIMS

## FIRST CAUSE OF ACTION

### DISCRIMINATION ON THE BASIS OF SEX (M.G.L. c. 151B)

### VS. MAN INVESTMENTS USA HOLDINGS, INC., AND MAN GROUP, LTD.

139. Plaintiff repeats and reavers the allegations set forth above in Paragraphs "1" through "138" as if fully stated herein.

140. The Company discriminated against Okuma because of her sex through the actions and omissions set forth above, on a continuing basis, up to and including by underpaying Okuma, subjecting her to a hostile work environment, and otherwise subjecting Okuma to disparate terms, conditions and privileges of employment because of her sex, and ultimately by terminating her employment.

141. The Company further discriminated against Okuma by failing to conduct a meaningful, good-faith investigation into her complaints of discrimination.

142. Accordingly, the Company violated G.L. c. 151B, § 4(1).

## SECOND CAUSE OF ACTION

### RETALIATION (M.G.L. c. 151B)

### VS. ALL DEFENDANTS

143. Plaintiff repeats and reavers the allegations set forth above in Paragraphs "1" through "142" as if fully stated herein.

144. As set forth herein, Plaintiff engaged in activities protected by G.L. c. 151B, including without limitation by making complaints about unequal pay and other mistreatment of women employees because of their sex.

145. As set forth herein, Defendants Man Investments USA Holdings, Inc., Man Group, Ltd., Antoine Forterre, and Roberto Canenti unlawfully retaliated against Okuma in various ways for her protected conduct, up to and including by terminating her employment.

## THIRD CAUSE OF ACTION

### MASSACHUSETTS PAID FAMILY MEDICAL LEAVE ACT (M.G.L. c. 175M)

### VS. MAN INVESTMENTS USA HOLDINGS, INC., AND MAN GROUP, LTD.

146. Plaintiff repeats and reavers the allegations set forth above in Paragraphs "1" through "145" as if fully stated herein.

147. Plaintiff availed herself of rights protected by the PFML, without limitation, by seeking and using medical leave under the statute.

148. The Company violated the PFML, G.L. c. 175M, § 9(a) by terminating Okuma's employment in whole or in part for her conduct protected by the statute.

149. Because the Company's termination of Plaintiff's termination took place within six (6) months of her use of PFML, her termination is presumed to be retaliatory and it is the

Company's burden to overcome that presumption with clear and convincing evidence, which the Company cannot do.

**FOURTH CAUSE OF ACTION**

**MASSACHUSETTS EQUAL PAY ACT DISCRIMINATION
(M.G.L. c. 149, § 105A)**

**VS. MAN INVESTMENTS USA HOLDINGS, INC., AND MAN GROUP, LTD.**

150. Plaintiff repeats and reavers the allegations set forth above in Paragraphs "1" through "149" as if fully stated herein.

151. The Company violated the Massachusetts Equal Pay Act ("MEPA"), G.L. c. 149, § 105A(b) by discriminating against Okuma in her pay on the basis of gender and/or by paying male employees more for comparable work.

**FIFTH CAUSE OF ACTION**

**MASSACHUSETTS EQUAL PAY ACT RETALIATION
(M.G.L. c. 149, § 105A)**

**VS. MAN INVESTMENTS USA HOLDINGS, INC., AND MAN GROUP, LTD.**

152. Plaintiff repeats and reavers the allegations set forth above in Paragraphs "1" through "151" as if fully stated herein.

153. As set forth herein, Plaintiff engaged in activities protected under MEPA, without limitation, by making internal complaints concerning pay disparities and indicating an intent to pursue legal action concerning the same.

154. The Company violated MEPA, G.L. c. 149, § 105A(c) by retaliating against Okuma for her conduct protected by statute, up to and without limitation by terminating Plaintiff's employment.

## SIXTH CAUSE OF ACTION

**FAILURE TO PROVIDE WAGE STATEMENTS AS REQUIRED BY NEW YORK LABOR LAW**
**(New York Labor Law §§ 195(3), 198(1)(D))**

**(*PLEAD IN THE ALTERNATIVE* VS. MAN INVESTMENTS USA HOLDINGS, INC., AND MAN GROUP, LTD.)**

155. Plaintiff repeats and reavers the allegations set forth above in Paragraphs "1" through "154" as if fully stated herein.

156. In the alternative, if New York law is applicable, pursuant to New York Labor Law § 195(3), employers, such as the Company, are required to furnish employees, such as Plaintiff, with a statement of every payment of wages, listing the following: the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any claimed as part of the minimum wage; net wages; the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked.

157. Throughout the relevant time period, by discriminating against Plaintiff in her pay on the basis of her gender and/or by paying male employees more for comparable work the Company failed to furnish to Plaintiff, along with each payment of wages, a statement accurately listing: rate or rates of pay and basis thereof; gross wages; deductions; and net wages; in violation of NYLL § 195(3).

158. As the Company failed to provide Plaintiff with accurate payroll notices as required by NYLL § 195(3), she is entitled to liquidated damages in the amount of $250.00 per day for every day in which the violation occurred, up to a maximum of $5,000.00, along with reasonable attorneys' fees and costs.

## SEVENTH CAUSE OF ACTION

## VIOLATIONS OF § 296, ET. SEQ., OF THE EXECUTIVE LAW OF THE STATE OF NEW YORK ON BEHALF OF THE PLAINTIFF AGAINST DEFENDANTS – DISCRIMINATION ON THE BASIS OF SEX

## (*PLEAD IN THE ALTERNATIVE* VS. ALL DEFENDANTS)

159. Plaintiff repeats and reavers the allegations set forth above in Paragraphs "1" through "158" as if fully stated herein.

160. In the alternative, if New York law is applicable, it is a violation of § 296, et seq., of the Executive Law of New York (hereinafter "Executive Law") for employers such as Defendants to discriminate in the terms and conditions of employment because an employee such as Plaintiff is a member of a statutorily protected class of individuals.

161. It is a violation of the New York State anti-discrimination law for an employer such as the Company to discriminate in the terms and conditions of employment because an employee such as Plaintiff is a member of a statutorily protected class of individuals.

162. It is a violation of the New York State anti-discrimination law for a supervisor such as Forterre to discriminate in the terms and conditions of employment because an employee such as Plaintiff is a member of a statutorily protected class of individuals.

163. It is a violation of the New York State anti-discrimination law for a supervisor such as Canenti to discriminate in the terms and conditions of employment because an employee such as Plaintiff is a member of a statutorily protected class of individuals.

164. It is a violation of the New York State anti-discrimination law for an aider and abettor such as Forterre to discriminate in the terms and conditions of employment because an employee such as Plaintiff is a member of a statutorily protected class of individuals.

165. It is a violation of the New York State anti-discrimination law for an aider and abettor such as Canenti to discriminate in the terms and conditions of employment because an employee such as Plaintiff is a member of a statutorily protected class of individuals.

166. Employees that have the terms and conditions of their employment changed, by underpaying and otherwise subjecting employees to disparate terms, conditions and privileges of employment because of their sex, as well as being terminated from employment, because of their gender, are defined by the Executive Law and by case precedent as a protected class.

167. Plaintiff was and is a member of the aforesaid protected class.

168. The aforesaid, conduct, actions and behavior of the Company, Forterre and Canenti, their agents, servants or employees, were based upon Plaintiff's membership in the aforesaid protected class, in violation of the aforesaid New York State anti-discrimination statutes.

169. That any and all alleged reasons, explanations or justifications for the aforesaid conduct, behavior and actions, were and are a pretext for discrimination.

170. In addition to suffering a significant loss of wages, income, bonuses, out-of-pocket expenses, perks and benefits, Plaintiff was caused to suffer physical injuries, stress, humiliation, emotional and psychological damages, mental pain and suffering, will continue to so suffer in the future, all because of the Company, Forterre and Canenti's outrageous and reprehensible conduct in violating Plaintiff's rights.

171. As a proximate result of the Company, Forterre and Canenti's conduct, Plaintiff has been adversely affected in her employment opportunities, her normal life's pursuits, and she believes that these injuries have and will continue to have an irreparably devastating effect upon

the quality of her life, and will prevent her from functioning as she did prior to the occurrences complained of herein.

172. That the aforesaid actions, conduct and behavior of the Company, Forterre and Canenti, their agents, servants and employees, are beyond what is considered reasonable and acceptable in a civilized society, and shocks the conscience, and thus warrants an award of punitive damages.

173. Plaintiff, therefore, seeks monetary damages for this cause of action in addition to an award of interest, court costs, and disbursements.

**EIGHTH CAUSE OF ACTION**

**(VIOLATIONS OF § 296, ET. SEQ., OF THE EXECUTIVE LAW OF THE STATE OF NEW YORK ON BEHALF OF THE PLAINTIFF AGAINST DEFENDANTS – RETALIATION)**

***(PLEAD IN THE ALTERNATIVE, VS. ALL DEFENDANTS)***

174. Plaintiff repeats and reavers the allegations set forth above in Paragraphs "1" through "173" as if fully stated herein.

175. In the alternative, if New York law is applicable, it is a violation of § 296, et seq., of the Executive Law of New York (hereinafter "Executive Law") for employers such as Defendants to retaliate against an employee such as Plaintiff for complaints of discrimination in the workplace.

176. It is a violation of Executive Law for employers such as the Company to retaliate against an employee such as Plaintiff for complaints of discrimination in the workplace.

177. It is a violation of Executive Law for a supervisor such as Forterre to retaliate against an employee such as Plaintiff for complaints of discrimination in the workplace.

178. It is a violation of Executive Law for a supervisor such as Canenti to retaliate against an employee such as Plaintiff for complaints of discrimination in the workplace.

179. It is a violation of Executive Law for an aider and abettor such as Forterre to retaliate against an employee such as Plaintiff for complaints of discrimination in the workplace.

180. It is a violation of Executive Law for an aider and abettor such as Canenti to retaliate against an employee such as Plaintiff for complaints of discrimination in the workplace.

181. Plaintiff made a complaint of discrimination in the workplace.

182. The aforesaid, conduct, actions and behavior of Defendants, their agents, servants or employees, were based upon Plaintiff's complaint of discrimination, in violation of the aforesaid Executive Law.

183. That any and all alleged reasons, explanations or justifications for the aforesaid conduct, behavior and actions, were and are a pretext for retaliation.

184. In addition to suffering a significant loss of wages, income, bonuses, out-of-pocket expenses, perks and benefits, Plaintiff was caused to suffer physical injuries, stress, humiliation, emotional and psychological damages, mental pain and suffering, will continue to so suffer in the future, all because of Defendants' outrageous and reprehensible conduct in violating Plaintiff's rights.

185. As a proximate result of Defendants' conduct, Plaintiff has been adversely affected in her employment opportunities, her normal life's pursuits, and she believes that these injuries have and will continue to have an irreparably devastating effect upon the quality of her life, and will prevent her from functioning as she did prior to the occurrences complained of herein.

186. That the aforesaid actions, conduct and behavior of the Defendants, their agents, servants and employees, are beyond what is considered reasonable and acceptable in a civilized society, and shocks the conscience, and thus warrants an award of punitive damages.

187. Plaintiff, therefore, seeks monetary damages for this cause of action in addition to an award of interest, court costs, and disbursements.

## NINTH CAUSE OF ACTION

## VIOLATIONS OF § 194, ET. SEQ., OF THE OF THE LABOR LAW OF THE STATE OF NEW YORK ON BEHALF OF PLAINTIFF AGAINST DEFENDANTS – PAYMENT OF WAGES AT A RATE LESS THAN EMPLOYEES WITHOUT STATUS IN THE SAME PROTECTED CLASS

**(*PLEAD IN THE ALTERNATIVE* VS. MAN INVESTMENTS USA HOLDINGS, INC., AND MAN GROUP, LTD.)**

188. Plaintiff repeats and reavers the allegations set forth above in Paragraphs "1" through "187" as if fully stated herein.

189. In the alternative, if New York law is applicable, it is a violation of § 194, et seq., of the Labor Law of New York (hereinafter "Labor Law") for employers such as the Company to pay an employee such as Plaintiff at a rate less than the rate paid without status within the same protected claim for (a) equal work on a job the performance of which requires equal skill, effort, and responsibility, and which is performed under similar working conditions; or (b) substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions.

190. Plaintiff was and is a member of the aforesaid protected class.

191. The aforesaid, conduct, actions and behavior of the Company, their agents, servants or employees, resulted in Plaintiff being paid at a rate less than employees without status in the aforesaid protected class in the same establishment were paid for (a) equal work on

a job the performance of which requires equal skill, effort, and responsibility, and which is performed under similar working conditions; or (b) substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions in violation of the aforesaid Labor Law.

192. That any and all alleged lawful reasons, explanations or justifications for the aforesaid disparities were and are a pretext.

193. Plaintiff, therefore, seeks monetary damages for this cause of action, in the full amount of any such unlawful disparity in the rate pay as well as an additional amount as liquidated damages in addition to an award of interest, court costs, and disbursements.

## TENTH CAUSE OF ACTION

### VIOLATIONS OF § 195, ET. SEQ., OF THE OF THE LABOR LAW OF THE STATE OF NEW YORK ON BEHALF OF PLAINTIFF AGAINST DEFENDANTS – FAILURE TO PROVIDE TERMINATION NOTICE

### (*PLEAD IN THE ALTERNATIVE* VS. MAN INVESTMENTS USA HOLDINGS, INC., AND MAN GROUP, LTD.)

194. Plaintiff repeats and reavers the allegations set forth above in Paragraphs "1" through "193" as if fully stated herein.

195. In the alternative, if New York law is applicable, pursuant to New York Labor Law § 195(6), employers, such as the Company, are required to furnish employees, such as Plaintiff, at the time of her termination with a notice containing the following information: in writing, of the exact date of such termination as well as the exact date of cancellation of the employee benefits connected with such termination. In no case shall notice of such termination be provided more than five working days after the date of such termination. Failure to notify an employee of cancellation of accident or health insurance subjects an employer to an additional

penalty pursuant to section two hundred seventeen of the NYLL chapter (the "Termination Notice.")

196. That the Company never furnished Plaintiff with a Termination Notice.

197. As such, the Company is in violation of NYLL, § 195(6).

198. As a result of the foregoing, Plaintiff is entitled to liquidated damages plus costs and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter the following relief:

1. Lost wages and benefits, compensation for emotional distress, consequential damages, in the amount of six million ($6,000,000.00) dollars, in addition to an award of punitive damages, liquidated damages, attorneys' fees, costs, and statutory interest, and

2. Such further relief as the Court deems meet and just.

**JURY DEMAND**

Plaintiff demands a TRIAL BY JURY on all claims so triable.

Dated: New York, New York
May 15, 2026

Respectfully Submitted,

SARAH OKUMA,

By Her Attorneys,

Alan J. Bennett (AJB-1635)
alan@alanjbennettpllc.com
Alan J. Bennett, PLLC
Attorneys for Plaintiff
369 Lexington Avenue
Suite 217
New York, NY 10017
(212) 696-2116